FILED

2003 OCT 14  P 2: 31

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **M.L. on behalf of G.L.,** | ) | **CIVIL ACTION NO.** |
| **Plaintiff** | ) | **3:02 CV1885 (WWE)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **WILTON BOARD OF EDUCATION** | ) | |
| **Defendant** | ) | **OCTOBER 14, 2003** |

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR DE NOVO REVIEW

The plaintiffs bring the instant action under 20 U.S.C. §1415 of the Individuals with

Disabilities Education Act (IDEA) against defendant Wilton Board of Education, seeking to

reverse the underlying administrative "due process" hearing decision and an award of attorneys'

fees and costs as a "prevailing party."[1]  On or about September 15, 2003, the plaintiffs moved for

*de novo* review and the defendant moved for summary judgment.  The defendant now submits

the instant memorandum in opposition to the plaintiff's motion for de novo review.


**ORAL ARGUMENT REQUESTED**
**TESTIMONY NOT DESIRED**

---

[1] It is significant that the plaintiffs' October 15, 2003 motion was entitled a "motion for de novo review" which is not a dispositive motion consistent with the Federal or Local Rules of Civil Procedure.  Regardless of the title of the motion, the plaintiffs failed to comply with Local Rule 9(c) by filing a "Local Rule 9(c)1 Statement" and therefore, this Court may deny the plaintiffs' alleged dispositive motion on these grounds alone. See Rule 56 of the Fed.R.Civ.Proc. (providing for Summary Judgment not De Novo Review); L.Civ.R. 9(c) (requiring Local Rule 9(c)1 Statement of Material Facts Not In Dispute).

*LAW OFFICES* • **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC** • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

The defendant asserts that its own previous motion for summary judgment, as well as its Local Rule 9(c)(1) Statement of Undisputed Facts and memorandum of law in support of its motion for summary judgment not only support the defendant's request that judgment be entered in its favor, but these previously filed pleadings also serve as an objection to the plaintiffs' motion for de novo review.  Accordingly, the defendant requests that the court consider the arguments set forth in its September 15, 2003 filings so as to avoid the need for unnecessarily duplicative briefing.

This matter can be resolved by summary judgment practice despite the plaintiffs' representations otherwise.[2]  Although the plaintiffs have alleged that the additional evidence they submitted to their motion tilts the scales of justice in their favor, the "new" evidence does not at all yield the result desired by the plaintiffs – a reversal of the underlying State Department of Education Administrative Due Process Hearing Decision. See Grimm v. Rhinebeck Central School District, 2003 U.S.App. LEXIS 20594 (2d Cir. 2003), attached hereto.  Nevertheless, in addition to asserting that the plaintiffs' motion for summary judgment should be denied, the defendant also asks that its motion for summary judgment be granted.

---

[2] See note 1, supra.

2

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

## II.    ARGUMENT

### A.    THE BOARD DID NOT COMMIT ANY PROCEDURAL VIOLATIONS THAT WOULD AMOUNT TO A DENIAL OF A FREE APPROPRIATE PUBLIC EDUCATION AND THE DUE PROCESS HEARING OFFICER'S DECISION SHOULD BE UPHELD.

The plaintiff contends that the Board "…committed severe enough procedural safeguard violations to have the IEP offered for 2001-2002 be declared null and void." Plaintiffs' September 15, 2003 Memorandum of Law in support of Plaintiffs' Motion For Modified De Novo Review [hereafter "Plaintiffs' Brief"], pp. 4-7. The Board is, quite frankly, shocked by the plaintiffs' position and their blanket assertion that the IEP should be declared null and void because of the lack of a regular education teacher at G.L.'s IEP meeting for the 2001-02 school year. Id., p. 6.[3] The defendant is even more stunned by the plaintiffs' conclusory assertions that the IEP's are missing "objective contents and evaluation procedures." Id., p.7. There is no reference to the particular IEP referenced by the plaintiffs in their brief, Id., and the plaintiff failed to tie in the alleged missing individual (regular education teacher) and missed information with an explanation of the alleged prejudice to the plaintiff-minor child.

---

[3] The reliance by plaintiffs on W.G. v. Board of Trustees of Target Ranger Sch. Dist., 960 v. F.2d 1479, 1484 (9th Cir. 1992) and Board of Educ. of City Sch. Dist. of Yonkers, 21 IDELR 630 (SEA NY 1994), is entirely misplaced because the hearing officers in these case found a variety of procedural violations that, in total, amounted to a violation of the IDEA. Such circumstances are not at all evident in this case and therefore, these cases are distinguishable.

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

Any deficiency in the IEP process must result in prejudice to the student or his parents before a court may find that the IDEA was violated. See O'Toole By and Through O'Toole v. Olathe Dist. Schools Unified School Dist. No. 233, 144 F.3d 692, 707 (10th Cir. 1998) (noting that "technical deviations" from the IDEA's requirements do not "render an IEP entirely invalid."); Urban, 89 F.3d 720, 726 (10th Cir. 1996) (holding that a deficient IEP "did not amount to a denial of an appropriate education"); accord Roland M. V. Concord Sch. Comm., 910 F.2d 983, 994 (1st Cir. 1990)(stating that "procedural flaws do not automatically render an IEP legally defective"), cert. denied, 499 U.S. 912, 111 S.Ct. 1122 (1991).  The instant case is not about procedural violations in the IEP document that deprived the family of necessary data concerning the student's initial abilities and deficits needed to measure his subsequent performance and plan for his program. See, e.g., M.S. v. Bd. of Ed. of the City of Yonkers, 231 F.3d 96, 104 (2nd Cir. 2000).  Rather, the plaintiffs contend that, generally speaking, the IEP is materially defective; yet, the plaintiffs point to no concrete information in the exhibits that reveals the alleged fatal weaknesses to the document.  The plaintiffs' blanket accusations are not sufficient to sustain their burden of proof on this issue, especially given the fact that the hearing officer found that:

> [t]here has been no expert testimony that the goals and objectives set forth in the Student's current IEP are not appropriate or are lacking in any way, and the mother had participated in the PPTs where the goals and objectives were developed and she agreed to them.

4

Final Decision and Order 01-351, Conclusion #20, p. 32, attached as Exhibit A to Plaintiffs

Complaint, and to Defendant's September 15, 2003 Memorandum of Law in support of their

Motion for Summary Judgment [hereinafter referred to as "Exhibit A"]  There is simply no

prejudice demonstrated by the plaintiffs that amounts to a procedural violation in this case and

the hearing officer's decision should be upheld in this regard.

Furthermore, the plaintiffs failed to raise their objections to the IEP and to the lack of a

regular education teacher at a PPT meeting.[4] See A.S. v. Bd. of Educ., 245 F.Supp.2d 417, 428

(D.Conn. 2001).  Connecticut state law requires that "no issue may be raised at [a due process]

hearing unless it was raised at a [PPT] meeting for such child." Conn. Gen. Stat. §10-76h(a)(1).

"Such a requirement is consistent with, and parallel to, the IDEA requirement that available

administrative remedies be exhausted before a special education claim is brought to court. See 20

U.S.C. §1415(i). Lillbask ex rel. Mauclaire v. Sergi, 117 F.Supp.2d 182, 190 (D.Conn. 2000).

The documentary evidence and testimony at the due process hearing indicate that the plaintiff did

not assert at any PPT meeting that there were defects in the IEP goals and objectives, or that the

parent objected to the lack of a regular education teacher at the PPT. Exhibit A, p. 13 and 32.

Accordingly, these claims were waived by the plaintiffs and cannot now be raised as an appeal to

this Court. A.S. v. Bd. of Educ., 245 F.Supp.2d at 428.

---

[4] Indeed, the plaintiffs failed to even raise as an issue the lack of a regular education teacher until the written briefs
were filed by the parties at the conclusion of the evidentiary portion of the administrative due process hearing. See
Exhibit A, Finding #42, p.13.

5

**B. THE HEARING OFFICER CORRECTLY CONCLUDED THAT THE BOARD'S IEP WAS REASONABLY CALCULATED TO PROVIDE MEANINGFUL BENEFIT TO THE STUDENT IN THE LEAST RESTRICTIVE ENVIRONMENT AND THAT A RESIDENTIAL PLACEMENT WAS NOT NECESSARY.**

It is well settled that the IDEA does not require that a student receive an education that maximizes the student's potential. Board of Education v. Rowley, 458 U.S. 176, 197-198 (1982). In this case, the plaintiffs are really attempting to persuade this court, as it attempted to do with the hearing officer, that the Student deserves an educational program in the form of a Cadillac, not a Chevrolet. Doe v. Bd. of Educ. of Tullahoma City Schools, 9 F.3d 455, 459-460 (6th Cir. 1993) The requests of the plaintiffs go far beyond what public school systems are required to provide to children who are identified for special education services.  The hearing officer - who was in the best position to weigh the testimony in this case – heard the Board witnesses describe what was being provided to the Student and found that the educational program, including all the related services, was appropriate.  What the plaintiffs are seeking in terms of residential placement – at the point in time that they made the request  - is far beyond what was contemplated by Congress.

> [T]he Act sets more modest goals: it emphasizes an appropriate, rather than an ideal, education; it requires an adequate, rather than an optimal, IEP. Appropriateness and adequacy are terms of moderation. It follows that, although an IEP must afford some educational benefit to the handicapped child, the benefit

6

conferred need not reach the highest attainable level or even the level needed to maximize the child's potential.

Lenn v. Portland School Committee, 998 F.2d 1083, 1086 (1st cir. 1993)

In this regard, the administrative hearing record exemplifies the collaborative decisionmaking process where the PPT met on numerous occasions to formulate reasonable, objective goals for the Student and to provide a detailed account of services that would permit the Student to benefit from his educational program. The Board witnesses testified that they believe that the Student has progressed in the Board's program. Dr. Karan, See Defendants Rule 9(c)(1) Statement of Facts Not In Dispute(hereinafter "Proposed Finding"), Proposed Finding 64; Ms. Valiente, Proposed Finding 32; Ms. DeFrancesco, Proposed Finding 58; Mrs. Powell, Proposed Finding 71, and Mr. Lupanicci, Proposed Finding 70. This evidence is a testament to the hard work that the Board's staff has contributed to the student's program given the serious nature of the Student's disabilities. The plaintiffs' witnesses that testified at the underlying hearing regarding the Student's program had not observed the Board's program and did not know the IEP that was in place for the Student and therefore, the testimony of the Board's witnesses   . See Grimm v. Rhinebeck Central School District, 2003 U.S.App. LEXIS 20594*13-17. This is not a case where the plaintiffs are accusing the Board of a denial of FAPE for several years. Ironically, however, the plaintiffs are requesting services that go far beyond what is

7

necessary for the student to achieve benefit from his educational program. See Defendant's Memorandum of Law in support of its Motion for Summary Judgment, at pp. 12-17.

. The plaintiffs rely on Mrs. B. and the case of Naugatuck Bd. of Educ. v. Mrs. D., 10 F.Supp.2d 170 (D.Conn. 1998) to support their position that residential placement is warranted for the Student. Plaintiffs' Brief, pp. 12-17. The Board in its September 15, 2003 Memorandum of Law, at pp. 19-21, discussed the Second Circuit standard for residential placement as set forth in Mrs. B. v. Milford Board of Education, 103 F.3d 1114, 1120 (2d cir. 1997), and already distinguished the facts of this case in comparison to those of Mrs. B. The Mrs. D. case is also distinguishable from the instant case in that the Naugatuck Administration admitted that its public schools were not appropriate for the student, and the PPT had therefore recommended an outplacement for the student in a therapeutic educational placement several years before the issue of residential placement. 10 F.Supp 2d at 174. In sharp contrast to the facts of Mrs. D., the Board's witnesses in the instant case reiterated in their testimony throughout the underlying administrative due process hearing that the Board could provide an educational program for the Student in the Wilton Public Schools, coupled with additional related services in the home. At the time the underlying administrative due process hearing in this case had been requested, the Student also had not been outplaced in any out-of-district day placements and thus, the continuum of educational placements in the least restrictive environment had not been tried which is distinguishable from the facts of Mrs. D.

LAW OFFICES  •  SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC  •  646 PROSPECT AVENUE  •  HARTFORD, CONNECTICUT 06105-4286  •  (860) 233-2141
JURIS NO.  62326

Furthermore, the plaintiffs' contention that the Student required a residential placement, even though his IEP and members of the Planning and Placement team stated otherwise, directly contradicts P.J. v. Conn. Bd. of Education where a school district was found to violate the IDEA by trying to place a mentally retarded child out of district before evaluating the child and writing an IEP. 788 F.Supp. 673, 681-82 (D.Conn. 1992). Subsequent to the cases of Mrs. B. and Mrs. D., the Connecticut State Department of Education entered into a Consent Decree regarding P.J. See State Department of Education Circular Letter C-8 dated August 15, 2002 and State Department of Education Position Statement on the Education of Student with Disabilities, attached hereto. The Connecticut State Department of Education, consistent with the IDEA mandates, encourages student learning in the least restrictive environment to the maximum extent appropriate. Id; 20 U.S.C. §1412(5)(B); 34 C.F.R. §§300.550-300.556.

In the absence of a hearing officer Order concluding that the IEP is inappropriate, there is no basis to order residential setting as requested by the plaintiffs.

### C. THE PLAINTIFFS WERE NOT DENIED DUE PROCESS AND TO THE EXTENT THAT THE PLAINTIFFS NOW ARGUE THAT THE HEARING OFFICER WAS BIASED OR THAT THE CONDUCT OF THE UNDERLYING PROCEEDING WAS TILTED IN FAVOR OF THE BOARD, THE PLAINTIFFS' FAILURE TO MOVE TO RECUSE THE HEARING OFFICER IS FATAL TO THEIR CLAIMS IN THE INSTANT CASE.

The plaintiffs claim that the Student was denied due process as a direct result of the hearing officer's conduct in the underlying proceeding. The defendant already briefed this issue

LAW OFFICES  •  SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC  •  646 PROSPECT AVENUE  •  HARTFORD, CONNECTICUT 06105-4286  •  (860) 233-2141
JURIS NO. 62326

in its September 15, 2003 Memorandum, at pp. 22-27, and respectfully request that this Court refer to the additional arguments raised therein. To the extent that the plaintiffs touch upon only two issues that were not initially raised by the defendant in their previous filing with this court, the defendant responds accordingly.

The Supreme Court has recognized that not every case of judicial disqualification rises to the level of a Constitutional challenge. Aetna Life Insurance Co. v. Lavoie, 475 U.S. 813, 820-21, 106 S.Ct. 1580 (1986). However, a judge's failure to recuse himself where a person's liberty or property is subject to a ruling of a court wherein the judge has a "direct, personal, substantial, pecuniary interest in reaching a decision against him" provides grounds for a valid Fourteenth Amendment claim. Aetna, 475 U.S. at 821-22, citing Turney v. State of Ohio, 273 U.S. 510, 47 S.Ct. 437 (1927). See, also, In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623 (1955) (the Due Process Clause prohibits a judge from sitting in his own case or where he has an interest in the outcome). While the Supreme Court has recognized that it is difficult to define a precise standard to be applied to all cases, it has firmly stated that general allegations of bias and prejudice are insufficient to establish any constitutional violation. Aetna, 475 U.S. at 820-21. A decisionmaker is not disqualified simply because he or she has taken a position, even in public, on a policy issue related to the dispute, in the absence of a showing that he is not "capable of judging a particular controversy fairly on the basis of its own circumstances." United States v. Morgan, 313 U.S. 409, 421 (1941).

10

The only basis for the plaintiffs' due process claim in this case is that Attorney Gary Mayerson was not permitted to speak at the Student's hearing unless he was admitted or unless the hearing officer was given assurance from the State of Connecticut that his representation was not the unauthorized practice of law. See Plaintiffs' September 15, 2003 Brief, p. 18.  In the comments of the hearing officer, as in the transcript of this hearing, the plaintiffs' counsel both agreed that Attorney Annemette Schmid would be the attorney-spokesperson for the family during the course of the due process hearing. Exhibit A, Conclusion #19, p.31.  It was only until after Attorney Mayerson's Pro Hac Vice Motion was not granted that the plaintiffs took issue with the hearing officer's decision, and at that time, the Board would have been unduly prejudiced had the hearing officer dismissed the case without prejudice.  Attorney Mayerson could have received an opinion letter from the State of Connecticut Ethics Commission, but for whatever strategic reason, chose not to do so.  The plaintiffs were afforded a meaningful opportunity to be heard and to participate in the underlying due process hearing in that plaintiffs' counsel presented documentary and testimonial evidence, cross-examined witnesses, and presented legal argument. If the plaintiffs believed that the hearing officer was biased, a motion for recusal could have been filed.  At this juncture, the plaintiffs' arguments are mere conjecture. The plaintiffs' failure to brief this matter in more detail and cite caselaw in support of their position provides ample grounds for this Court to deny these claims.  Even if this court decides to liberally construe the plaintiffs' allegations, the examples cited by the plaintiffs in their brief

11

simply do not support the reversal of the underlying administrative hearing officer's decision on constitutional due process grounds.[5]

## III.    CONCLUSION

For the foregoing reasons, and the reasons provided in its September 15, 2003 memorandum in support of defendant's motion for summary judgment, the defendant asks that this court grant its motion for summary judgment. The defendant also asks that this court deny the plaintiffs' motion for de novo review.

                    THE DEFENDANT,
                    WILTON BOARD OF EDUCATION


                    By: _Nicole Bernabo_____
                    Nicole A. Bernabo
                    Federal Bar No. ct19783
                    Sullivan, Schoen, Campane & Connon, LLC
                    646 Prospect Avenue
                    Hartford, Connecticut 06105
                    Telephone:  (860) 233-2141
                    Facsimile:  (860) 233-0516
                    E-mail:  nbernabo@sscc-law.com

---

[5] To support their claims of bias the plaintiffs' reference the act that the hearing officer later recused herself from another matter. See Plaintiffs' September 15, 2003 Brief, at p. 19. This argument is entirely irrelevant, and the Exhibit would not be admitted at trial in this matter, because no foundation has been laid by the plaintiffs to show that the hearing officer's recusal was due to the relationship with plaintiffs' counsel and not the other party in the case. Moreover, at the time the hearing officer recused herself, see Exhibit 6, she was named as another party in litigation by Attorney Gary Mayerson and such grounds at that time would be proper. That later action by the hearing officer, however, is not relevant to any bias at the time of the hearing in the instant case.

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

## **CERTIFICATION**

This is to certify that a copy of the foregoing Memorandum in opposition to the Plaintiffs' Motion for de novo review was sent via first-class mail, postage prepaid, on this 14[h] day of October 2003 to:   Annemette Schmid, Esq., Harris & Harris, 11 Belden Avenue, 2nd Floor, Norwalk, CT 06850; and Gary Mayerson, Esq., 250 West 57th Street, Suite 624, New York,  NY 10107.

Nicole A. Bernabo

*LAW OFFICES*  •  **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC**  •  646 PROSPECT AVENUE  •  HARTFORD, CONNECTICUT 06105-4286  •  (860) 233-2141
JURIS NO.  62326

LEXSEE 2003 US APP LEXIS 20594

**JOAN GRIM and STEVEN GRIM, parents of a disabled child, Chelsea, Plaintiffs-Appellees, v. RHINEBECK CENTRAL SCHOOL DISTRICT, Defendant-Appellant.**

**Docket No. 02-7483**

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

*2003 U.S. App. LEXIS 20594*

**January 13, 2003, Argued**
**October 8, 2003, Decided**

**PRIOR HISTORY:** [*1] Appeal from a final judgment entered by the United States District Court for the Southern District of New York (Lisa Margaret Smith, Magistrate Judge), reversing administrative determinations by officers of the New York Education Department; holding that the individualized education programs issued by defendant school district for the education of plaintiffs' daughter, a student with a disability, were inadequate under the *Individuals with Disabilities Education Act*; and awarding plaintiffs tuition reimbursement for daughter's attendance of a private school designed for students with her disability. *Grim v. Rhinebeck Cent. Sch. Dist., 2003 U.S. App. LEXIS 18672 (2d Cir. N.Y., Sept. 9, 2003)*

**DISPOSITION:** Reversed.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** MARK C. RUSHFIELD (Michael K. Lambert, on the brief), Shaw & Perelson, LLP, Poughkeepsie, NY, for Defendant- Appellant.

ROSALEE CHARPENTIER, Family Advocates, Inc., Kingston,. NY, for Plaintiff-Appellee.

**JUDGES:** Before: LEVAL and CABRANES, Circuit Judges, and AMON, District Judge. *

* The Honorable Carol B. Amon, of the United States District Court for the Eastern District of New York, sitting by designation.

**OPINIONBY:** . JOSE A. CABRANES

**OPINION:** .

JOSE A. CABRANES, *Circuit Judge*:

Defendant appeals from the District Court's award of $ 51,603.13 in private-school [*2] tuition reimbursement to plaintiffs under the *Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.* The District Court held that the individualized education programs proposed by the defendant school district for the education of the plaintiffs' daughter were insufficient to provide the student with a "free appropriate public education" as required by the *IDEA*. In so holding, the District Court reversed decisions denying reimbursement rendered by two Impartial Hearing Officers ("IHOs") and affirmed by a State Review Officer ("SRO") of the New York State Education Department.

Having reviewed the record before the District Court, we reverse the judgment of the District Court and enter judgment affirming the administrative determinations of the New York State Education Department.

**BACKGROUND**

**I. The *IDEA***

The *IDEA* offers federal funds to states that develop plans to assure "all children with disabilities" a "free appropriate public education," *20 U.S.C. § 1412(a)(1)(A)*. To meet the requirements of the *IDEA*, each student with a disability must receive "special education and related services" [*3] designed to serve the student's needs. *Id. § 1401(8)*. Such services must be

administered according to an "individualized education program" ("IEP"), which school districts must implement each year for each student with a disability. *Id. § 1414(d)*.

IEPs are subject to considerable procedural and substantive requirements, *id.*, but they are not required to "furnish[] . . . every special service necessary to maximize each handicapped child's potential," *Board of Education v. Rowley, 458 U.S. 176, 199, 73 L. Ed. 2d 690, 102 S. Ct. 3034 (1982).* Rather, the *IDEA* requires that IEPs provide a "basic floor of opportunity," consisting of services that are "individually designed to provide educational benefit" to a child with a disability. *Id. at 201.*

The *IDEA* further imposes on school districts developing IEPs a strong preference for "mainstreaming," or educating children with disabilities "[t]o the maximum extent appropriate" alongside their non-disabled peers. *20 U.S.C. § 1412(a)(5).* We have interpreted this provision as a requirement that special education be provided in the "least restrictive setting consistent [*4] with a child's needs." *Walczak v. Florida Union Free School District, 142 F.3d 119, 122 (2d Cir. 1998).*

New York parents who believe an IEP is insufficient under the *IDEA* may challenge it in an "impartial due process hearing," *20 U.S.C. § 1415(f),* before an IHO appointed by the local board of education, *see N.Y. Educ. L. § 4404(1).* At that hearing, the school district has the burden of demonstrating the appropriateness of its proposed IEP. *See, e.g., Walczak, 142 F.3d at 122* (collecting cases). The decision of an IHO may be appealed to an SRO, *see N.Y. Educ. L. § 4404(2); see also 20 U.S.C. § 1415(g),* and the SRO's decision may in turn be challenged in either state or federal court, *see 20 U.S.C. § 1415(i)(2)(A).*

## II. Facts and Procedural History

Plaintiffs-Appellees Steven and Joan Grim enrolled their daughter, Chelsea, in Defendant- Appellant Rhinebeck Central School District for first and second grades. Toward the end of her second-grade year, Chelsea was tested at her parents' request and classified as "learning disabled." Accordingly, the [*5] school district developed an IEP outlining a program of special education for her. Chelsea began receiving instruction pursuant to the IEP during the final month of her second-grade year in June 1995.

During the summer of 1995, the Grims concluded that the IEP was insufficient to meet Chelsea's needs, so they unilaterally removed her from the Rhinebeck public schools and enrolled her in the private Kildonan School

("Kildonan"), which specializes in the education of dyslexic students. Kildonan teaches according to the Orton-Gillingham method, "a language based remedial program for students who have specific difficulties in the phonological encoding and decoding of the language." *See Grim v. Rhinebeck Central School District,* No. 98 Civ. 4854, slip op. at 20-21 (S.D.N.Y. Mar. 29, 2002) (citation omitted).

Near the conclusion of Chelsea's third-grade year at Kildonan, the Grims formally challenged the adequacy of the IEP that had been developed the previous spring ("the 1995-96 IEP") by requesting an impartial hearing before an IHO, as authorized by the *IDEA.* They sought reimbursement from the Rhinebeck Central School District for the expense of sending Chelsea to Kildonan. After [*6] hearing extensive testimony, the IHO determined on March 14, 1997 that the 1995-96 IEP was appropriate and legally sufficient under the *IDEA,* and further, that Kildonan was not an appropriate placement for Chelsea because of the *IDEA's* preference for educating students in the "least restrictive environment." An SRO affirmed the IHO's decision on March 10, 1998.

In the summer of 1996, defendant school district again prepared an IEP to guide the provision of special education to Chelsea during her approaching fourth-grade year ("the 1996-97 IEP"), as required by the *IDEA.* Concluding that the 1996-97 IEP was insufficient to meet Chelsea's needs, the Grims enrolled Chelsea in Kildonan for a second year. They later concluded that defendant's proposed IEP for Chelsea for her fifth-grade year ("the 1997-98 IEP") was similarly insufficient, so Chelsea remained at Kildonan for a third year.

Plaintiffs' subsequent challenges to the sufficiency of the 1996-97 and 1997-98 IEPs were consolidated before a single IHO. The IHO held that both IEPs "offered an appropriate public education in the least restrictive environment," *id.* at 55, and that the procedures followed in their development [*7] adequately complied with the *IDEA, id.* An SRO affirmed the decision of the IHO. *Id.*

## DISCUSSION

### I. Judicial Review Under the *IDEA*

Federal courts reviewing administrative determinations under the *IDEA* must base their decisions on "the preponderance of the evidence," taking into account not only the record from the administrative proceedings, but also any further evidence presented before the District Court by the parties. *See 20 U.S.C. § 1415(i)(2)(B).* The Supreme Court and our Court have interpreted the *IDEA* as strictly limiting judicial review of state administrative decisions. *See Rowley, 458 U.S. at 204- 08; Walczak, 142 F.3d at 129.* Federal courts

reviewing administrative decisions must give "due weight" to the administrative proceedings, "mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Walczak, 142 F.3d at 129* (quoting *Rowley, 458 U.S. at 206, 208*) (internal quotation marks omitted).

The Supreme Court in *Rowley* also held that the *IDEA* established [*8] a two-fold inquiry for courts reviewing administrative determinations: "First, has the State complied with the procedures set forth in *the Act*? And second, is the individualized educational program developed through *the Act*'s procedures reasonably calculated to enable the child to receive educational benefits?" *Rowley, 458 U.S. at 206-07* (footnote omitted).

## II. Procedural Violations of the *IDEA*

Conducting this two-part inquiry, the District Court first held that all three challenged IEPs at issue were inadequate under the *IDEA*.

The first violation the Court identified was extensive delay in Rhinebeck School District's development and review of all three challenged IEPs-at least that portion of the considerable delays for which the plaintiffs were not themselves responsible. *Grim, No. 98 Civ. 4854, slip op. at 64-67.*

The District Court then proceeded to identify a further violation in all three challenged IEPs, namely, their formulaic articulation of goals and strategies for evaluating Chelsea's progress. Specifically, the Court held that "the rote use of [a single] phrase in practically every objective of [the 1995-96] IEP is facially insufficient [*9] to meet the requirements of the *IDEA*." *Id.* at 71. The 1996-97 and 1997-98 IEPs, according to the Court, "echo[]" and fail to solve the problems of this first IEP. *Id.* Therefore, reversing the SRO, the District Court found that, even though delay did not independently render the IEPs insufficient under the *IDEA, id.* at 66-67, the combination of the delay and this second violation was sufficiently serious to render all three IEPs inadequate under the *IDEA, see id.* at 70-71.

The District Court correctly noted that the Supreme Court, interpreting the IDEA in *Rowley,* n1 emphasized the importance Congress attached to the statute's procedural requirements as "safeguards" of the rights protected by the *IDEA. See id.* at 63. Specifically, the *Rowley* Court noted that compliance with the significant procedural provisions of the *IDEA* "would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *Rowley, 458 U.S. at 206.* As the District Court recognized, however, it

does not follow that every procedural error in the development of an IEP renders that IEP legally inadequate under the *IDEA. See* [*10] Grim , No. 98 Civ. 4854, slip op. at 63.

> n1 In fact, the Supreme Court in Rowley interpreted the *Education for All Handicapped Children Act of 1975*, which was subsequently amended and renamed the *IDEA. Walczak, 142 F.3d at 122.* For consistency, we refer to the relevant statute as the *IDEA*

It is no doubt true that administrative delays, in certain circumstances, can violate the *IDEA* by depriving a student of his right to a "free appropriate public education." For example, if a student were actually being educated under an inappropriate IEP, and state officers failed to review it in a timely manner, the delay might, in a particular instance, constitute a violation of the *IDEA.* That was not the case here. As discussed below, we uphold the administrative determinations that the IEPs for all three years were adequate to confer an educational benefit on Chelsea. Had her parents chosen to avail themselves of these programs, they would have been available to Chelsea for the years in question. Because the programs [*11] were both appropriate and available, any delay in resolving the parents' challenges to them cannot have prejudiced Chelsea's education. *See J.D. v. Pawlet School District, 224 F.3d 60, 69-70 (2d Cir. 2000).*

The absence of prejudice is particularly clear in the context of the Grims' actions. Chelsea's parents removed her from the school district and placed her in Kildonan for the 1995-96 school year months before they challenged the IEP for that year. Chelsea remained at Kildonan for all the years at issue, and there is no suggestion in the record that the Grims would have altered their placement decision had their challenges to the IEPs been resolved in a more timely fashion. *See Amann v. Stow School System, 982 F.2d 644, 653 (1st Cir. 1992)* (holding that an untimely decision upholding an IEP caused no remediable harm where there was no evidence that the late decision affected parents' decision to enroll child in private school); *see also Heather S. v. Wisconsin, 125 F.3d 1045, 1060 (7th Cir. 1997)* (same). In these circumstances, we cannot conclude that Chelsea's right to a free appropriate public education was in any way endangered [*12] by delays in the State's administrative review process.

It is not clear from the District Court's opinion whether the Court would have considered the IEPs'

inadequate articulation of objectives a violation of the *IDEA* if this inadequacy had not been compounded by delay. However, having reversed the District Court's holding on the legal effect of delay, it is sufficient for our purposes to note that-whether a procedural or a substantive issue-the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the *IDEA* requires deference to the expertise of the administrative officers. Accordingly, the *Rowley* requirement that courts give "due weight" to determinations by administrative bodies charged with implementation of the statute, applied below to flaws the District Court identified as "substantive," applies with equal force to administrative determinations of the adequacy of objectives set forth in an IEP.

### III. Substantive Violations of the *IDEA*

In addition to the procedural defects the District Court identified with respect to all three of the IEPs in question, the District Court identified substantive violations of the *IDEA* in the 1996-97 and [*13] 1997-98 IEPs, finding that "neither . . . IEP was reasonably calculated to provide educational benefit to Chelsea." *Grim*, No. 98 Civ. 4854, slip op. at 81. According to the Court, the 1996-97 IEP was substantively inadequate because it did not sufficiently augment the services provided by the 1995-96 IEP in response to test scores that revealed that the student failed to progress during the preceding year. *Id.* at 77. Additionally, both the 1996-97 and 1997-98 IEPs were substantively inadequate because, according to the District Court, "at the second [IHO] hearing," during which the IHO evaluated both these later IEPs, "the testimony only support[ed] the conclusion that the Orton-Gillingham approach was the appropriate approach for teaching Chelsea." *Id.* at 78.

In *Rowley*, the Supreme Court overturned the reversal of an administrative decision under the *IDEA*, holding that the reviewing court had impermissibly "impos[ed its] view of preferable educational methods upon the States" by accepting the testimony of experts as to "the best method for educating the deaf." *Rowley, 458 U.S. at 207* & n. 29. The Supreme Court noted that adopting the expert [*14] opinion was inappropriate for a court reviewing administrative determinations under the IDEA, because the optimal method for deaf education was "a question long debated among scholars," and the same expert evidence had been presented to, and found insufficient by, the SRO. *Id.*

Our Court applied the *Rowley* standard in *Walczak*, in which we overturned a District Court's reversal of an SRO's decision under the *IDEA*. In *Walczak* we noted that, in order for the District Court to conduct an "independent" review of the sufficiency of an IEP under

the *IDEA* that does not "impermissibly meddl[e] in state educational methodology," it must examine the record for "any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan." *Walczak, 142 F.3d at 130* (quoting *Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1121 (2d Cir. 1997)* (citing *Rowley, 458 U.S. at 203, 207)*) (internal quotation marks omitted). We noted that such "objective evidence" is most easily interpreted in the form of grades in mainstream classes, but that "test scores and similar objective criteria" could also be [*15] considered. *Id.*

Despite the District Court's contention that its holding did not violate *Rowley* by "imposing [its] view of preferable education[al] methods upon the States," *Grim*, No. 98 Civ. 4854, slip op. at 81 (quoting *Rowley, 458 U.S. at 207*) (internal quotation marks omitted), the Court's judgment reflects precisely the type of subjective credibility assessment that *Rowley* held to be inappropriate. The District Court concluded that Chelsea must be educated using a single educational methodology in a fully segregated environment in order to receive the "educational benefit" sufficient to meet the "basic floor of opportunity," *Rowley, 458 U.S. at 201*, guaranteed by the *IDEA*. The Court reached this conclusion despite contrary holdings of the IHOs and SRO, and despite the *IDEA*'s preference for educating students in the least restrictive environment possible. It justified its conclusion by finding that "[n]either the IHO nor the SRO [reviewing the two later IEPs] gave appropriate consideration to the experts on dyslexia, who had personal knowledge of the student in question." *Grim*, No. 98 Civ. 4854, slip op. at 81. [*16] Accordingly, in violation of *Rowley*, the District Court impermissibly chose between the views of conflicting experts on a controversial issue of educational policy-effective methods of educating dyslexic students-in direct contradiction of the opinions of state administrative officers who had heard the same evidence. *See Rowley, 458 U.S. at 207* & n. 29.

For the foregoing reasons, we hold that the District Court misapplied the standard of review applicable in *IDEA* cases by not according appropriate deference to administrative determinations under the *IDEA* when it concluded that the 1996-97 and 1997-98 IEPs were substantively inadequate under the *IDEA*.

### CONCLUSION

In sum, we reverse the judgment of the District Court because it improperly held that the 1995-96, 1996-97, and 1997-98 IEPs were procedurally inadequate under the *IDEA*, and it erroneously held that the 1996-97 and 1997-98 IEPs were substantively inadequate under the *IDEA*. We therefore enter judgment in favor of the defendant, and affirm the SRO decisions denying

plaintiffs private-school tuition reimbursement for the 1995-96, 1996-97 and 1997-98 school years.

For the foregoing reasons, the [*17] judgment of the District Court is reversed.

# Position Statement On the Education of Students with Disabilities

Adopted January 3, 2001

The Connecticut State Board of Education believes that all students are unique and are influenced by cultural, linguistic, intellectual, psychological, medical, social and economic factors. These factors create a need for a varied educational environment that provides for, and accommodates, each child's strengths and areas of needed improvement. The Board also believes that a unified and coordinated continuum of educational opportunities and supports, designed to address individual needs, serves and benefits all students. The Board encourages the implementation of educational models that promote multiple instructional strategies which encourage and accommodate students in the general environment to the maximum extent appropriate. It is the responsibility and obligation of educators to design and provide teaching strategies, methods and materials that are suitable for each individual learner. As appropriate, a continuum of these strategies should be implemented before a child is referred to special education.

The Connecticut State Board of Education supports the principle that *Connecticut's Common Core of Learning* defines common goals for all students, including those with disabilities. Connecticut's public education system has the duty to provide opportunities for all students to achieve the statewide student goals (motivation to learn, mastery of the basic skills, acquisition of knowledge, competence in life skills and understanding society's values). The demonstrated performance of these skills, knowledge and attributes must become a greater focus and the acknowledged responsibility of all professionals in the education community. The Board presumes that these goals are best achieved in the child's local school, although it recognizes that some children who present significant and/or unique needs require placement in alternate settings to achieve those goals. Furthermore, the Board believes in the continuous monitoring of student growth and achievement.

Good practice requires that school districts:

1) Deliver support services based on early diagnosis of learning problems and early intervention strategies that accommodate different learning styles in the regular classroom, which results in fewer students unnecessarily being identified as requiring special education;

2) Align special education programs and services with all state, federal and local reform efforts to ensure involvement in all school improvement activities;

*(continued)*

3) Support full participation in state and district wide assessment activities designed to assess the degree to which basic skills are mastered;

4) Use current medical, educational and psychological research to inform best practices in teaching strategies;

5) Identify and support activities that will enhance and promote a school climate that is conducive to positive development for all children, including children with disabilities;

6) Provide training to <u>all</u> educators that prepares them to teach children with varying abilities, interests and learning styles, and that enables them to, with the use of supplementary aids and services, modify curriculum, deliver individually designed instruction and implement effective instructional practices in the least restrictive environment;

7) Identify and support actions necessary to promote the appropriate and positive involvement of students with disabilities in the total school program, including extracurricular activities;

8) Provide sufficient allocation and efficient use of resources to provide quality instruction that results in improved student outcomes and focuses on activities with clear educational benefit;

9) Involve parents of students with disabilities in planning and assessing all aspects of the student's educational program;

10) Develop a collaborative approach to service delivery that includes parental involvement, use of community-based resources, learning experiences that are school-based and community-based, and pupil services and supports (psychology, guidance, counseling, social work, speech and language and health services);

11) Provide a continuum of teaching and learning options and settings that foster high expectations, continuing improvement and challenging curriculum for all students, and that prepare students for eventual entry into higher education and the workplace; and

12) Identify student needs and the implementation of student and teacher accountability measures to assess growth and the impact of services.

The Board believes that implementation of these practices will encourage all students to value themselves as capable individuals who make successful transitions to further education and employment. As a result, students will be self-sufficient, productive and contributing members of society, able to make informed personal choices and function successfully as family members, workers, learners, citizens, friends and consumers.

# STATE OF CONNECTICUT
## *DEPARTMENT OF EDUCATION*



SERIES: 2002-2003
CIRCULAR LETTER: C-8

TO:        Superintendents of Schools

FROM:      Theodore S. Sergi
           Commissioner of Education

DATE:      August 15, 2002

SUBJECT:   LRE Initiative For Students With Disabilities


Each school-aged child with an intellectual disability or another disability is entitled to be educated with non-disabled children to the maximum extent appropriate. The State Board of Education has affirmed this right through its position statement, adopted January 3, 2001, on "Educating Students with Disabilities."

The Department believes that children with disabilities, including children in public or private institutions or other care facilities, should be educated with children who are not disabled to the maximum extent appropriate. Special classes, separate schooling, and other practices that result in the removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

Although the Department recognizes that some children who present significant and/or unique needs require placement in alternate settings to meet their needs, the Department supports the belief that goals for students with disabilities are consistent with the goals for all students as defined in Connecticut's Common Core of Learning and that these goals are best achieved in the child's local school.

A unified and coordinated continuum of educational opportunities and supports, designed to address individual needs, serves and benefits all students. The Department supports educational models that promote multiple instructional strategies to the maximum extent appropriate, which encourage and accommodate students in the general environment and the total school program including extracurricular activities. LEAs should anticipate the incorporation of certain SDE requirements, professional development activities, and technical assistance to help support the intent of this memorandum.

For further information, please contact Mr. George Dowaliby, Bureau Chief, Bureau of Special Education and Pupil Services, at 860-807-2025.

Box 2219   •   Hartford, Connecticut  06145
*An Equal Opportunity Employer*

Connecticut State Department of Education

**MEMORANDUM**                    Bureau of Special Education and Pupil Services
                                  25 Industrial Park Road
                                  Middletown, Connecticut 06457
                                  Telephone: (860) 807-2025
                                  Fax: (860) 807-2047
                                  E-Mail: George.Dowaliby@po.state.ct.us

TO:        Boards of Education Members, Superintendents of Schools, Due Process Officers, Higher
           Education Teacher Education Programs

FROM:      George P. Dowaliby, Chief
           Bureau of Special Education and Pupil Services

DATE:      August 15, 2002

SUBJECT:   LRE Initiative For Students With Disabilities

Each school-aged child with an intellectual disability or another disability is entitled to be educated with
non-disabled children to the maximum extent appropriate. The State Board of Education has affirmed
this right through its position statement, adopted January 3, 2001, on "Educating Students with
Disabilities."

It is important that Planning and Placement Teams (PPTs) follow an individual student decision-making
process with regard to identification of the least restrictive educational environment for each child who
has an intellectual disability or other disabilities. Within this planning framework, the PPT must first
consider the student's needs and how those needs would be met in the least restrictive setting, including
regular classes with supplementary aids and services. Special classes, separate schooling or other
removal of children with disabilities from the regular educational environment should occur only if the
nature or severity of the disability is such that education in regular classes with the use of supplementary
aids and services cannot be achieved satisfactorily.

The Bureau of Special Education and Pupil Services will be conducting oversight activities to ensure that
students with intellectual disabilities, whenever appropriate, are placed in regular classes, in home
schools, and in extracurricular activities with their non-disabled peers with appropriate supplemental aids
and services, that promising practices are used with regard to instruction in regular classes, and that,
whenever appropriate, students with intellectual disabilities or other disabilities who are placed out of
district are returned to their home districts.

To this end, the Bureau of Special Education and Pupil Services is firmly committed to moving forward
with this initiative and ensuring that students with intellectual disabilities or other disabilities are
receiving a free and appropriate public education in the least restrictive environment and that the PPT
process in Connecticut supports this direction. The Bureau's intent is to work cooperatively with LEAs
toward our joint obligation to achieve successful participation of students with intellectual disabilities to
the maximum extent appropriate in all aspects of the school program through actions such as placement in
home schools and regular classes, participation in extracurricular activities with appropriate
supplementary aids and services, and use of promising practices with regard to instruction in general
education classes.

If you have any questions or comments, please feel free to contact me at 860-807-2025.