UNITED STATES DISTRICT COURT 
DISTRICT OF CONNECTICUT

| | |
|---|---|
| M.L. on behalf of G.L., | : 3:02CV1885 (WWE) |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| WILTON BOARD OF EDUCATION, | : |
| Defendant | : |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND ON PLAINTIFF'S MOTION FOR *DE NOVO* REVIEW**

This is an action brought by M.L. on behalf of her minor child, G.L., pursuant to 20 U.S.C. § 1415, *et seq.*, of the Individuals with Disabilities Act ("IDEA"), against defendant Wilton Board of Education ("Board"). Plaintiff is seeking a reversal of the September 24, 2002, Decision and Order of the administrative hearing officer, which held that the Board had provided a free and appropriate public education ("FAPE") to G.L., and that the Board was under no obligation to fund G.L.'s placement at a residential facility. Plaintiff is also seeking an award of attorneys' fees and costs as a prevailing party.

Pending before the Court is the defendant's motion for summary judgment. For the reasons set forth below, the defendant's motion will be granted. For these same reasons, the Court need not reach the plaintiff's motion for *de novo* review, and will deny it as moot.

**FACTS**

For the purposes of this ruling, the following facts are

1

taken from the complaint and from the findings of fact contained in the State of Connecticut Department of Education's Final Decision and Order which was submitted with the complaint. The Court will attempt a brief summation of a lengthy record. G.L. was born on May 17, 1991, and moved shortly after birth to Italy, where he was diagnosed with infantile psychosis. No special education programs were provided for him for the first seven years of his life. In June, 1998, his family moved back to the United States, when G.L. was seven years of age, and took up residence in Wilton, Connecticut, where he was placed pending evaluation in a second grade class, his first placement in a formal education program. G.L. was diagnosed with an autistic spectrum disorder that places him on the severe end of the autism spectrum, and after the evaluation finding that the child was severely delayed, the Board placed him full time in a special education support center with speech and language and occupational therapy services. G.L. used a non-verbal communication system, and a progress report for the 1998-99 school year noted that G.L. exhibited extreme behaviors including biting, hitting, kicking, pinching, flopping to the floor, and loud vocalizations. In addition, G.L. was not toilet trained.

    The 1999-2000 school year showed improvement. He was making eye contact in response to his name, his aberrant behaviors decreased, and he was transitioning using the school hallways and

participating in specials with an aide.  G.L.'s program was moved to the Cider House School for the 2000-2001 school year.  The school building was newly renovated and age-appropriate for G.L., housing grades 3,4, and 5 for the school district, in accordance with the IDEA's goal of placing students in the least restrictive setting consistent with a child's needs.  G.L.'s classroom was centrally located in the building and adjoined the nurse's room.  There were 5 students in the support center, with a full-time special education teacher and up to four paraprofessionals. In addition to speech and occupational therapy services, G.L. received adaptive physical education, and went to general education music, art and library with his class.

In February, 2001, an assistive technology evaluation took place.  The Tech Speak communications device was purchased for G.L.'s use, and plans were made to begin a toileting program after the device was in place.  A toileting program was developed by the Eden Institute of New York State.  The program was instituted and used by the school district up to the time of the hearing officer's decision.

In early 2001, G.L.'s behavior worsened and he became more aggressive.  Medications were prescribed but seemed to worsen his aggressive behavior, which was directed primarily at his teacher, mother, and grandmother.  On February 17, 2001, G.L. became aggressive toward his mother, who called 911.  G.L. was taken to

Norwalk hospital by paramedics where he was admitted for evaluation and stayed for 9 days. At the hospital he had a 1:1 sitter due to his behavioral outbursts.

G.L. was discharged from Norwalk Hospital on February 26, 2001, and entered New York Presbyterian Hospital the same day, with the goal being to eliminate his violent outbursts, and allow him to return to home and school. He was discharged from the New York hospital on March 29, 2001. It was recommended that he return to Cider House School, but if the community supports identified by the hospital were not sufficient to keep him safe in the community, residential placement would then be considered. Upon return to school, there was a dramatic improvement in G.L.'s behavior. His ability to communicate was improving with the use of the Tech Speak, and good progress was being made with the toileting program. Plans were made for a summer program with a two week district component and a six week component at a private special education facility, primarily aimed at toilet training, but with a full range of services from academics to music therapy. Home services were also provided during the summer of 2001.

At the beginning of the 2001-2002 school year, G.L. was agitated and engaged in behaviors such as screaming, grabbing, biting and pulling hair. A functional behavior assessment was completed on G.L., and an individualized plan was formulated by

the staff, with environmental and programmatic changes, which had an immediate effect, resulting in significant improvement in G.L.'s behaviors.  However, according to his mother, G.L. was still experiencing unpredictable behavioral outbursts at home, and M.L. requested that the Board forward educational records to specific residential settings that M.L. had identified.  Because the cover letter included the statement that "the Planning and Placement Committee ("PPT") has not made a recommendation to seek residential placement," M.L. contends that G.L.'s procedural rights were violated.  She also alleges a procedural violation because there was no regular education teacher in attendance at the August 2001 PPT, and because the Individual Educational Placement ("IEP") was not tailored to G.L.'s unique and individual needs.

In the winter of 2001, the school team videotaped G.L. in various activities and situations during the school day, with M.L.'s full permission, for the purpose of enabling the family to see the strategies and techniques used in school so the family could implement the same techniques and strategies at home.  M.L. viewed the videotape but did not follow up in any other regard. A portion of the videotape was played at the hearing yielding the decision which is the crux of this lawsuit.

Expert testimony was heard from Dr. Karan, who had observed G.L. both at home and at school.  His opinion was that the

program provided by the school was a good one, and that G.L. should remain in his home-based school. He opined that due to the nature of G.L.'s disorder, G.L. could not learn behaviors in a residential program and then transfer those behaviors to the community. Dr. Karan recommended more services for G.L. on Sundays and evenings, more as respite services for the benefit of G.L.'s family.

M.L. testified at the hearing that she was interested in a residential placement for G.L. at Ben Haven because this facility operated group homes for adults, and individuals placed at this facility can remain throughout adulthood. The hearing officer found that such a plan removes the student permanently from his home, his school, and his community, and contradicts the least restrictive environment requirement of the IDEA. She also found that the Board met its burden of proof of the appropriateness of G.L.'s program and placement, and that the Board was not required to pay for the costs of education, including special education and related services, at a private school or facility for a child with a disability, as long as the Board made a FAPE available to the child. The hearing officer concluded that the overwhelming weight of the evidence showed that such a placement would not be in the short or long term best interests of G.L.

**DISCUSSION**

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." <u>Bryant v. Maffucci</u>, 923 F. 2d 979, 982 (2d Cir.), <u>cert. denied</u>, 502 U.S. 849 (1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. <u>American International Group, Inc. v. London American International Corp.</u>, 664 F. 2d 348, 351 (2d Cir. 1981). In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986). If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. <u>Celotex Corp.</u>, 477 U.S. at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. <u>Anderson</u>, 477 U.S. at 249.

"Federal courts reviewing administrative determinations under the IDEA must base their decisions on the preponderance of

the evidence, taking into account not only the record from the administrative proceedings but also any further evidence presented before the district court by the parties.  Federal courts reviewing administrative decisions must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." <u>Grim ex rel. Grim v. Rhinebeck Central School District</u>, 2003 WL 22300626, * at 2 (2d Cir. 2003) (reversing a district court's ruling in favor of parents, finding that the district court misapplied the standard of review in IDEA cases by not according appropriate deference to administrative decisions).

In the present case, the Court is presented with a complete and concise administrative record, and in its discretion, the Court granted the plaintiff's motion to submit additional evidence to supplement that record, in accordance with <u>Grim</u>, *supra*.

The Court does not discern any material factual issue genuinely in dispute in the present case, just strongly held opinions by both parties on what is the best course of treatment for G.L.  The hearing officer had before her all the documentation from the beginning of G.L.'s formal education, including psychiatric evaluations, and upwards of 10 days of

testimony from the people who knew and worked with G.L. on a routine basis. The Court will not attempt to substitute its judgment for that of the trained professionals who had intimate knowledge of the situation. However, the Court has delved into the documentation surrounding this case, and comes away with a sincere conviction that the hearing officer decided it correctly.

The Court also construes the Second Circuit's October 2003 decision in <u>Grim</u> as precluding *de novo* review by the Court, and accordingly, will grant the defendant's motion for summary judgment, and deny the plaintiff's motion for *de novo* review as moot. In the alternative, the Court will deny the plaintiff's motion for *de novo* review for failure to comply with the local rules by not filing a Local Rule 9(c)1 statement.

**CONCLUSION**

For the reasons set forth above, the defendant's motion for summary judgment (Doc. # 26) is GRANTED. The plaintiff's motion for *de novo* review (Doc. # 29 ) is DENIED as moot. The Clerk is instructed to close this case.

SO ORDERED this 27th day of October, 2003, at Bridgeport, Connecticut.

_____
WARREN W. EGINTON, Senior U.S. District Judge